## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 07 2020, 9:00 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT D.T. (FATHER)

Valerie K. Boots
Marion County Public Defender Agency – Appellate Division

Daniel G. Foote
Indianapolis, Indiana

ATTORNEYS FOR APPELLANT K.J. (MOTHER)

Valerie K. Boots
Marion County Public Defender Agency – Appellate Division

Danielle L. Gregory
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Matter of N.T. (Minor Child) and

D.T. (Father) and K.J. (Mother),

*Appellants-Respondents,*

v.

October 7, 2020

Court of Appeals Case No. 20A-JC-502

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge

| Indiana Department of Child Services,[1] | The Honorable Marcia J. Ferree, Magistrate |
|---|---|
| *Appellee-Petitioner*. | Trial Court Cause No. 49D09-1907-JC-1670 |

**Mathias, Judge.**

[1] D.T. ("Father") and K.J. ("Mother") appeal the Marion Superior Court's order adjudicating N.T., their minor child, a Child in Need of Services ("CHINS"). Father and Mother (collectively "Parents") argue that the Department of Child Services ("DCS") failed to prove by a preponderance of the evidence that N.T. is a CHINS.

[2] We affirm.

## Facts and Procedural History

[3] In June 2019, the parents and twenty-three-month-old N.T. resided together in an apartment in Beech Grove, Indiana. N.T. has several medical conditions that require specialized care and medical attention.

[4] On June 18, 2019, parents took N.T. to Peyton Manning Children's hospital where she was admitted due to her failure to thrive. N.T. weighed approximately fourteen pounds when she was admitted. During DCS's

---

[1] DeDe K. Connor filed an appearance on behalf of Appellee-Guardian ad Litem, Child Advocates, Inc., but did not file a brief on appeal.

investigation of N.T.'s welfare, N.T.'s primary care physician expressed concern about N.T.'s inability to gain weight while in the primary care of her parents. When she was admitted to the hospital, Dr. Cortney Demetris, the Child Abuse Pediatrician, concluded that N.T. was severely malnourished and suspected medical neglect.

[5] Because N.T. was able to gain weight during her hospital admissions but was not able to maintain or gain weight while in Parents' care, in July 2019, DCS filed a petition alleging that N.T. was a CHINS pursuant to Indiana Code section 31-34-1-1. Specifically, DCS alleged that N.T. was not receiving necessary medical treatment and that her parents were not following N.T.'s physicians' instructions and recommendations.

[6] In the petition, DCS noted that it had previously investigated a similar report of neglect of N.T. in 2018. The prior CHINS proceeding was dismissed because DCS believed that N.T.'s growth hormone deficiency could be contributing to her inability to gain weight. When DCS filed the July 2019 petition, N.T. had been prescribed growth hormone for several months but was not gaining weight while in the parents' care.

[7] CHINS fact-finding hearings were held on August 16, September 27, and October 7, 2019. The trial court adjudicated N.T. to be a CHINS. The trial court issued the following comprehensive findings of fact on January 16, 2020.

> 7. [Child] has multiple diagnoses that include schizencephaly, septo-optic dysplasia, diabetes insipidus, dysphagia requiring G-tube feeds, and failure to thrive.

8. [Child's] medical care includes the treatment by multiple disciplines, including endocrinology, ophthalmology, gastroenterology, neurology, pulmonary, occupational and physical therapy, vision therapy and nutrition. [Child] has 8-9 specialty doctors.

9. In 2018, [Child] was the subject of a DCS [CHINS] Petition where [Child's] failure to thrive was a safety concern.

10. According to Father, there was a Child and Family Team Meeting ("CFTM") held prior to the dismissal of that 2018 Petition, and at CFTM it was discussed and agreed to by DCS and Parents that [Child's] medical care would be transferred to Cincinnati Children's Hospital and that [Child] would be weighed twice weekly by an agency to ensure that she gained appropriate weight.

11. [Child's] medical care was transferred to Cincinnati Children's Hospital. For the time that [Child] received her medical care from Cincinnati Children's Hospital, Parents did not miss any appointments except for a few that were missed because of car accident that occurred on 3/22/2019, and according to Father, those appointments were rescheduled.

12. Parents scheduled [Child's] appointments on the same day and close in time so that [Child] could make multiple appointments in the same day.

13. [Child's] formula, medication for her salt and water imbalance and her growth hormone formula were shipped to Parents' home.

14. Father would pick up diabetes medicine and sometimes miraLAX for [Child] from the pharmacy.

15. On or near 1/18/2019, [Child] was admitted to Cincinnati Children's Hospital for failure to thrive. She was released 28 days later (on 2/15/2019), having gained weight in those 28 days.

16. Interim HealthCare was one of the agencies that weighed [Child] in her home. James Engelking is a registered nurse and case manager at Interim HealthCare and he first weighed [Child] on 4/18/2019. Interim was hired to do twice weekly in-home weight checks and "check-in" with the family, as ordered by Dr. Jain.

17. RN Engelking weighed [Child] 10-12 times in 9 weeks (from 4/18/2019-6/11/2019), and in that time the [Child's] weight fluctuated around 13-14 pounds and she gained only 1 pound 2 ounces.

18. Parents did not make [Child] available for weighs twice weekly. The weighs were scheduled for Tuesdays and Thursdays. The weighs were missed because Parents did not answer or return RN Engelking's phone calls.

19. Mr. Engelking weighed [Child] using an electronic scale that auto calibrates and weighed her wearing her diaper only. Mr. Engelking[] observed 2-3 boxes of Pedia[S]ure at the house, unopened and he never saw [Child] on her feeding machine.

20. Mr. Engelking said [Child] was cranky, fussy [and her] arms and legs were constricted about half the time he weighed her. On two separate occasions, [Child] lost weight between weighs. Mr. Engelking expressed his concern for this weight loss to Father. Father said okay and did not appear to be concerned.

21. [Child] also has a licensed physical therapist and occupational therapist through First Steps, Inc. Parents have

maintained these appointments and the therapy provided to [Child] is designed to improve her range of motion, strength, ability to sit, ability to reach, motor skills and the like. Both the physical therapist and occupational therapist have not had a problem with communicating with parents and parents have been open to the therapists' suggestions.

22. In addition, [Child] has a vision specialist. [Child] has optic nerve hypoplasia where the nerves are under developed, it is an under lying [sic] condition [of] her [] septo-optic dysplasia. The Vision Specialist specifically works with [Child] on visual attention and to help her to use the vision that she has.

23. First Steps, Inc. is an early intervention program for delay in any area for children up to 3 years old. First Steps is a community resource not tied to DCS' intervention which provides occupational, speech, and vision services.

24. During this time that [Child] was at home, Carol Glander, a Registered Dietician and a Pediatric Dietician with First Steps, worked with [Child]. The Court found her to be qualified as an expert in dietetics.

25. She testified that [Child's] needs are growth and feeding tolerance and the medical team makes all decisions about her feeding.

26. She began seeing [Child] in June 2018 and has continuously provided care for [Child] except for the month that [Child] was hospitalized in January 2019 at Cincinnati Children's Hospital.

27. Ms. Glander saw that [Child] lost weight and recommended that [Child] take Duocal. Duocal is an additive made with carbs and fats to provide additional calories. She recommended to

Parents that they talk to [Child's] medical providers about adding [duocal] to add calories to [Child's] diet. She attempted to contact [Child's] providers herself to make that recommendation but was unsuccessful, and she believes that Mother asked the medical team about adding Duocal.

28. Duocal was not added to [Child's] diet until June 2019 when she was hospitalized at St. Vincent and [Child] continues to receive it, but in a much lower amount than she was at St. Vincent.

29. Further, Ms. Glander recommended that [Child] have a scale so that she could be weighed by the same scale each time for accuracy.

30. Ms. Glander has observed that [Child] tolerates the current feeding regimen well versus her feeding regimen up to her admission at St. Vincent. She testified that with the feeding regimen prior to [Child's] admission at St. Vincent, she would see [Child] was fussy, and her belly [distended]. She recommended to Parents to keep a written log of [Child's] tolerance for feeding.

31. She found that the Parents were not difficult to work with and that they asked questions and followed her recommendations.

32. Ms. Glander observed that Parents would have trouble getting [Child] to take the total volume per day because of [Child's] reactions of vomiting, crying, and her belly sticking out.

33. Ms. Glander was concerned for [Child's] weight and nutrition for over a year and assessed that [Child] was not growing according to her trajectory.

34. Ms. Jenna Admundson is an assessment Family Case Manager ("FCM") for DCS and she received three 310-reports, on 6/17, 6/18 and 6/29, regarding [Child] and her parents. FCM Admundson had recent contact with parents during a 310 Assessment in April 2019.

35. On 6/17/2019, Parents drove to Cincinnati Children's Hospital for [Child's] scheduled doctors' appointments.

36. During the course of [Child's] appointments with her medical providers, her doctor strongly recommended that [Child] be admitted immediately because she was not gaining weight as she should.

37. Instead of following that recommendation, Mother and Father chose to take the [Child] home and then to Peyton Manning Children's Hospital at St. Vincent Hospital, hereinafter referred to as "St. Vincent"). If [Child] was going to be admitted to the hospital, the parents wanted her close to home.

38. When Parents left Cincinnati, they knew that [Child] needed to be admitted to the hospital because she was severely underweight and they knew that in the 9 weeks or more leading up to this recommendation, that [Child] had gained roughly one pound.

39. As of the next afternoon, Parents had not taken [Child] to St. Vincent or any other hospital.

40. Ms. Camille Drake is a DCS FCM and she met with Parents at their home sometime in the afternoon on 6/18/2019.

41. When she arrived, [Child] was feeding via G-tube and Parents were packing items to go the hospital.

42. Mother told her that she told Cincinnati Children's Hospital that they would be taking [Child] to St. Vincent when they got off work the following day, despite St. Vincent strongly recommending admission on the same day. FCM Drake told Parents to take [Child] to the hospital between 5:15-5:30 p.m. Parents and [Child] arrived at St. Vincent around 5:30 p.m. They waited in the ER waiting room until [Child] was admitted to the Hospital at 11:23 p.m.[]

43. At the time of admission, [Child's] home feeding regimen was 1050 calories per day of Pedia[S]ure Peptide fed over 15 hours.

44. According to Father, the current feeding instructions from Cincinnati Children's Hospital were to increase rate of flow and decrease the hours of feeding weekly and her hours of feeding were down to about 15 hours.

45. Upon admission, St. Vincent started [Child's] feed at the same number of calories that the parents reportedly were giving her at home and adjusted the feeding rate.

46. [Child] was admitted to St. Vincent Hospital on 6/18/2019 at 11:23 p.m. and was discharged at 2:47 p.m. on 8/12/2019 (9 weeks later).

47. When [Child] first arrived in her hospital room, RN Hannah Raspopovich observed Father pick up and carry [Child], with one arm without supporting [Child's] head and body, to her hospital bed and carelessly set her in her bed. Given [Child's] medically fragile state, this concerned RN Raspopovich and she noted it in the medical records.

48. On 6/22/2019, Parents stayed overnight in [Child's] hospital room. At 2:00 a.m., on the 23rd, RN Shelby M Nolot observed that [Child's] feeding pump was placed on the side of the crib closest to the door and was running appropriately. When RN Nolot returned to the room 2 hours later, the feeding pump had been moved to the opposite side of the crib and was turned off. The hospital staff denied entering room and turning off the feeding pump.

49. Pursuant to doctor's orders, the feeding pump was to be on and continuously feeding [Child].

50. At approximately 9:00 a.m. on 6/23/2019, RN Catherine Schwab, entered [Child's] hospital room and the feeding pump was off again. RN Schwab turned the feeding pump on to resume feeding. Parents were in the room sleeping.

51. On 6/23/2019, Dr. Large discussed with Parents about them turning off the feeding pump. Dr. Large explained that [Child] was to be feeding continuously for 24 hours. Parents did not deny turning off the feeding pump and expressed that they did not want [Child] to be on continuous feed without breaks. Mother was upset that [Child] was being fed 24 hours a day and she felt her stomach needed a break.

52. Mother and Father told Dr. Large that they thought [Child] should be discharged from the hospital because she was doing fine at home with them. Parents were adamantly opposed to the 24-hour feeding schedule.

53. Dr. Large explained that the plan was to condense feeds to run over 15 hours per day as per home schedule, but that the current order is for 24 hours. Physician discussed with Parents the importance of continuous feeds at that time considering [Child] was severely malnourished and needed to gain weight.

54. Mother and Father both testified that they did not turn off the feeding pump.

55. On 7/31/2019, [Child] weighed 7.39 kg or 16 pounds 4 ounces. From 6/18/19 to 7/31/19, [Child] gained 2 pounds and 3 ounces. On average, she gained 24 grams/day.

56. On 8/4/2019, RN Megan Kilma unhooked [Child] from her feeding pump at the request of the parents so that they could bathe her. Parents agreed they would turn the feeding pump back on when they were finished bathing her, but they did not and left the room. RN Kilma hooked [Child] back up to her feeds and parents returned while she was doing so. RN Kilma left the room again and when she returned the parents were gone and [Child's] tubing was clamped off and her feed was running into her farrel[1] bag, causing her not to receive feed for 2 hours.

57. Doctor Courtney Demetris is a part of the Child Protection Team at St. Vincent and Riley Hospitals. She is a pediatric hospitalist at St. Vincent Hospital.

58. She is board certified in pediatrics and child abuse pediatrics. The court qualified her as an expert witness in the areas of pediatrics and child abuse pediatrics.

59. During [Child's] admission at St. Vincent, Dr. Demetris cared for [Child] when she was on duty as a hospitalist. In her expert opinion, [Child] suffered from medical neglect and the basis for that opinion was her review of medical records and her personal care of [Child].

60. Dr. Demetris' expert opinion is that at the time of admission to St. Vincent, [Child] was severely malnourished. The Z score reflects the severity of a patient's malnutrition and it takes into

consideration a patient's weight and length. [Child's] Z score reflected severe malnutrition. Specifically, her Z score was negative 3.0, anything below 5, is an indicator of severe malnutrition.

61. Dr. Demetris explained that severe malnutrition can result in death. Further, it prevents a patient from standard growth and development.

62. According to Dr. Demetris, [Child] does gain weight when she is given proper calories and her malnutrition is secondary to her other conditions. In her expert opinion, there is no medical reason for [Child] not gaining weight.

63. In Dr. Demetris' review of the medical records, there were several incidents when parents were not following medical advice.

64. Dr. Demetris believes that the Parents failed to follow medical professional advice and that failure resulted in the [Child] becoming malnourished. According to Dr. Demetris, the home feeding regimen that included 1050 calories a day, if followed, would have provided [Child] with the calories she needed to gain weight.

65. [Child] gained significant weight at the hospital on the same calorie intake that she was reportedly receiving at home which was about 1050 calories per[] day.

66. While at St. Vincent she gained an average of 25 grams/day and the goal for [Child] is 10-15 grams/day.

67. In fact, as of 7/31/2019, [Child] was receiving fewer calories that what she was supposed to receive at home and she continued to gain weight in excess of the goal.

68. According to Dr. Demetris, any changes made to her feeds during her stay at St. Vincent provided less total calories than she was getting at home and would not explain why she was not gaining weight at home.

69. At admission to St. Vincent, 6/18/2019, [Child] weighed 6.39 kg (14.08 pounds). At discharge, [Child] weighed over 17.5 pounds.

70. [Child] gained over 3 ½ pounds in the 9 weeks she was at St. Vincent and in the 9 weeks at home leading to her admission, she gained only about 1 pound.

71. Sheila Grimm began supervising parenting time in the middle of July until 8/12/2019 at St. Vincent. She went every day and the Parents arrived at the hospital with her for supervised parenting time.

72. Once supervised parenting time started, there were no further reports by the hospital that Parents disconnected the feeding tube.

73. Ms. Grimm has never found parents to be difficult to work with and she describes both parents as well researched in [Child's] diagnoses and that they are there for [Child] 100%. Mother and Father have never been resistant to her suggestions.

74. During supervised parenting time, she has observed Parents work together as a team, and display great nurturing and comfort to [Child], including bathing her, painting her nails, applying

lotion, massaging her hair. At that time and currently she has no safety concerns for [Child] in parents' care. Currently, she is working with parents regarding gaining employment.

75. [A.J.] is [Child's] maternal grandmother. In 2018, [Child] was in her home when [Child] was about 7 months old and she was with her for a month. The reasons for the placement were the same issues of [Child] struggling to gain weight. [Child] was inpatient at Riley and she was released to her. [Child] is now with her again, about 3 days a week, Friday-Monday morning and [Child] is with [L.B.], paternal grandmother, 5 days a week, Monday-Friday.

76. Currently, [Child] receives [PediaSure] peptide over a 22-hour feed and she is gaining weight. As of the fact finding, [Child] weighed about 20 pounds 7 ounces.

77. Both grandmothers have trained through St. Vincent on [Child's] medications and feeding machine, and both report they will continue to be a support for Parents.

78. [Child] has received a [Bureau of Developmental Disabilities Services] BDDS waiver and she will get a skilled nurse and respite care, among other services. Further, Aviana nursing service is set to be in place and will provide 24-hour nursing services.

79. Mother has contacted CICOA for therapeutic services as a possible an additional resource. Medicaid pays for CICOA therapeutic services.

80. Ms. August Hatter is a DCS Permanency FCM and she was assigned to [Child's] case on or near 7/1/2019.

81. She has conducted 2 CFTMs since this case opened. She described Father's demeanor during CFTMs as aggressive and hostile. He continuously interrupts others when they are talking and he dominates the conversation. He believes that he knows more than the doctors and that [Child's] weight loss was due to her kidney condition.

82. He said that the State only provides services "when [s***] hits fan" and that the services offered now should have already been provided a year ago.

83. DCS recommends that Mother participate in Home Based Therapy and Home Based Casework to help find her find part-time employment and parenting education. DCS recommends that Father participate in home based therapy due to his anger.

84. For [Child], DCS recommends nursing services 24 hours/day, to attend all doctors' appointments, and to have a First Steps evaluation.

85. DCS argues that the coercive intervention of the Court is necessary to ensure that the family follows the doctors' recommendations.

86. Despite [Child] having been admitted to the hospital for severe malnutrition and for no other reason, Mother and Father were insistent about maintaining the home feeding regimen and did not want it changed to include 24 hour feeds. Parents acted against medical advice when they turned off [Child's] feeding pump.

87. [Child] gained weight as medically expected during her time at Cincinnati Children's hospital in January 2019, at St. Vincent in July 2019 and in placements with her grandmothers.

88. The inability or unwillingness of Parents to recognize that [Child] was not thriving causes great concern for the safety and well-being of [Child] in their care and services are needed in order to ensure that [Child] will maintain proper nourishment in the care of Parents.

89. Even when community services were in place, [Child] still became severely malnourished in her Parents' care.

90. The coercive intervention of the Court is necessary to ensure that [Child] will receive the appropriate nutrition in the care of her Parents.

91. The Court finds that [Child] is a minor child in need of services because [Child's] physical or mental condition is seriously impaired or endangered due to the neglect of parents to provide her the appropriate medical care, in that she became severely malnourished while in their care without medical reason.

Father's App. pp. 114–121. The trial court placed N.T. in the care of her paternal grandmother.

[8] The trial court issued its dispositional and parental participation orders on January 24, 2020. Both parents were ordered to participate in homebased therapy. Father was also ordered to complete a Father Engagement program and parenting assessment. Mother and Father now appeal.

# Discussion and Decision

[9] Parents argue that DCS failed to prove that N.T. was endangered or that the coercive intervention of the court was necessary. It is well-settled that

[i]n all CHINS proceedings, the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code. When reviewing a CHINS adjudication, we do not reweigh evidence or judge witness credibility and will reverse a determination only if the decision was clearly erroneous. A decision is clearly erroneous if the record facts do not support the findings or if it applies the wrong legal standard to properly found facts.

*V.B. v. Ind. Dep't of Child Servs.*, 124 N.E.3d 1201, 1208 (Ind. 2019) (citations and quotation marks omitted).

[10]   DCS alleged that N.T. was a CHINS pursuant to Indiana Code section 31-34-1-1, which provides that a child under the age of eighteen is a CHINS under the following circumstances:

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision;
>
> > (A) when the parent, guardian, or custodian is financially able to do so; or
> >
> > (B) due to the failure, refusal, or inability of the parent, guardian, or custodian to seek financial or other reasonable means to do so; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> > (A) the child is not receiving; and
> >
> > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[11] "That final element guards against unwarranted State interference in family life, reserving that intrusion for families 'where parents lack the ability to provide for their children,' not merely where they 'encounter difficulty in meeting a child's needs.'" *J.B. v. Ind. Dep't of Child Servs.*, 2 N.E.3d 1283, 1287 (Ind. 2014) (quoting *Lake Cty. Div. of Fam. & Child. Servs. v. Charlton*, 631 N.E.2d 526, 528 (Ind. Ct. App. 1994)). When considering this requirement, "courts should consider the family's condition not just when the case was filed, but also when it is heard." *Gr.J. v. Ind. Dep't of Child Servs.*, 68 N.E.3d 574, 580 (Ind. 2017) (quotations omitted). "Doing so avoids punishing parents for past mistakes when they have already corrected them." *Id.* at 581.

[12] Mother and Father challenge the trial court's CHINS adjudication by focusing on the evidence establishing that they provided necessary medical care for N.T. We agree with the Parents that N.T. did not lack the medical care that she required. And the facts of this case are complicated because N.T.'s significant medical conditions impact her ability to gain weight.

[13] However, DCS presented evidence that Parents do not always follow the recommendations and treatment plans prescribed by N.T.'s medical providers.[2]

---

[2] Parents challenge the trial court's finding that they did not make N.T. available for weigh-ins twice weekly. James Engelking, the service provider who performed N.T.'s weight checks, testified that he was often only able to weigh N.T. once per week due to lack of communication from Parents. Tr. Vol. 1, p. 185. Engelking was required to weigh N.T. on Tuesdays and Thursdays, but the timing of his visits to Parents' home was not consistent. He attempted to communicate with Parents to let them know when he would arrive at their home for the weight check, but Parents did not respond. *Id.* at 210. The Parents may have had good reasons for not being present when Engelking arrived at their home, but they failed to communicate with him concerning their availability for weight checks. This evidence supports the trial court's finding.

Most concerning, Parents have not followed N.T.'s prescribed feeding plan. As a result, when N.T. was admitted to the hospital in June 2019, Dr. Cortney Demetris, an expert in Child Abuse Pediatrics, concluded that N.T. was severely malnourished, and the doctor suspected medical neglect.[3]

[14] DCS proved that while N.T. was in Parents' care between hospital admissions, she was unable to maintain weight gain. However, while N.T. was hospitalized at St. Vincent's for almost two months, she gained three pounds, seven ounces and was able to maintain the weight gain. N.T. continued to gain weight, although at a slower place, after her discharge from the hospital in August 2019 while placed in her grandmothers' care.

[15] During N.T.'s hospitalization, medical providers observed on more than one occasion that Parents had turned off N.T.'s feeding tube against doctor's orders. Tr. Vol. I, p. 92. Dr. Demetris testified that N.T. gains weight when she is given proper calories; therefore, N.T.'s "severe malnutrition is secondary to her not receiving the feedings when" N.T. is not in the hospital setting. Tr. Vol. 1, p. 91. Dr. Demetris opined that N.T. should have been gaining and maintaining

---

[3] Parents argue that the evidence that they waited twenty-four hours to admit N.T. to St. Vincent's after medical providers at the hospital in Cincinnati strongly advised Parents admit her immediately does not support the CHINS adjudication. The Parents do not agree that they were advised to have N.T. admitted immediately. When the DCS service provider arrived at their home, Parents were making preparations to take N.T. to the hospital. Because Parents were complying with their medical providers advice, albeit not as rapidly as those providers or DCS would have liked, we agree with Parents that their delay in taking N.T. to the hospital would not support the CHINS adjudication absent the other evidence discussed above.

her weight while in parents care if she was given proper feedings.[4] *Id.* at 92. Father was argumentative with Dr. Demetris which made it difficult for her to communicate with him about N.T.'s care. Tr. Vol. 1, pp. 94–95.

[16] Parents cite to their own testimony that they do not turn off N.T.'s feeding tube against doctor's orders. But it was within the province of the trial court to weigh their testimony against that of the medical providers, and we will not reweigh the evidence on appeal.

## Conclusion

[17] The evidence of N.T.'s severe malnutrition combined with Parents' decision to turn off N.T.'s feeding tube against the medical providers orders establishes that N.T.'s physical or mental condition is seriously endangered as a result of Parents' neglect. This same evidence also supports the trial court finding that the coercive intervention of the court is necessary to ensure that N.T. receives the care and treatment she requires.

[18] For all of these reasons, we affirm the trial court's order adjudicating N.T. a CHINS.

Bradford, C.J., and Najam, J., concur.

---

[4] The Parents argue that N.T. gained weight while hospitalized at St. Vincent's because the doctors at that facility changed her prescription and method of feeding. However, N.T.'s caloric intake stayed the same throughout her hospital stay. Tr. Vol. 1, pp. 151–52. And the number of calories per kilogram of body weight decreased during her hospital stay. *Id.* at 153.